# 17-3234-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

JESUS FERREIRA,

*Plaintiff-Appellant,*

— v. —

CITY OF BINGHAMTON, KEVIN MILLER, Police Officer,

*Defendants-Appellees,*

CITY OF BINGHAMTON POLICE DEPARTMENT, JOSEPH ZIKUSKI,
as Police Chief of the Binghamton Police Department, JOHN DOES 1 Through
10, whose names are fictitious and identities are not currently known, JOHN
SPANO, Police Sergeant, LARRY HENDRICKSON, Police Sergeant,
ROBERT BURNETT, Police Sergeant,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF AND SUPPLEMENTAL APPENDIX FOR
## DEFENDANTS-APPELLEES

BRIAN S. SOKOLOFF
SOKOLOFF STERN LLP
*Attorneys for Defendants-Appellees*
179 Westbury Avenue, Suite 201
Carle Place, New York 11514
(516) 334-4500

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION ................................. 1

ISSUES PRESENTED ..................................................................................... 2

STATEMENT OF THE CASE ........................................................................... 3

    A.  Intelligence .................................................................................. 3

    B.  Surveillance ................................................................................. 3

    C.  The SWAT Team Activation & Briefing ...................................... 3

    D.  The Plan ...................................................................................... 4

    E.  SWAT's Choice of Equipment & Tactics ..................................... 5

    F.  The Entry ..................................................................................... 8

    G.  Plaintiff's Versions of Events ....................................................... 9

    H.  City's Version of Events ............................................................. 11

    I.  Securing the Scene ..................................................................... 13

    J.  Provision of Medical Care .......................................................... 14

    K.  Expert Testimony ....................................................................... 15

    L.  Procedural History ..................................................................... 15

SUMMARY OF THE ARGUMENT ................................................................19

ARGUMENT .............................................................................................22

Point I ................................................................................................22
THIS COURT SHOULD AFFIRM THE DISMISSAL
OF ALL CLAIMS, ISSUES, AND ARGUMENTS PLAINTIFF
HAS NOT PRESERVED FOR APPEAL IN HIS BRIEF

Point II ...............................................................................................23
OFFICER MILLER CANNOT BE NEGLIGENT FOR INTENTIONAL ACTS

Point III ..............................................................................................26
THIS COURT SHOULD AFFIRM THE LOWER
COURT'S DENIAL OF PLAINTIFF'S MOTION FOR
JUDGMENT NOTWITHSTANDING THE VERDICT

Point IV...............................................................................................33
THERE IS NO BASIS FOR RESPONDEAT SUPERIOR
LIABILITY AGAINST THE CITY OF BINGHAMTON

Point V ...............................................................................................34
THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S
NEGLIGENCE CLAIM AGAINST THE CITY OF BINGHAMTON

A. Plaintiff Failed to Establish a "Special Duty"...............................34

B. Plaintiff Conflates "Governmental Immunity" and "Special Duty"...........36

C. Plaintiff's Own Acts Caused His Injury.......................................40

CONCLUSION ..........................................................................................44

## TABLE OF AUTHORITIES

CASES

24/7 Records, Inc. v. Sony Music Entertainment,
    429 F.3d 39 (2d Cir. 2005) ................................................. 22

Applewhite v. Accuhealth, Inc.,
    21 N.Y.3d 420 (2013) ...................................................... 35

Arteagha v. State of New York,
    72 N.Y.2d 212,(1988) ...................................................... 40

Bawa v. City of New York,
    94 A.D.3d 926 (2d Dep't 2012) ............................................ 34

Bikowicz v. Sterling Drug, Inc.,
    161 A.D.2d 928, 983 (3d Dep't 1990) (3d Dep't 1990) ...................... 41

Bodine v. Warwick,
    72 F.3d 393 (3rd Cir. 1995) .............................................. 41

Brady v. Wal-Mart Stores, Inc.,
    531 F.3d 127 (2d Cir. 2008) ................................... 28, 29, 31

Bryant v. Ciminelli,
    267 F.Supp.3d 467 (W.D.N.Y. 2017) ........................................ 36

Clancy v. County of Nassau,
    142 A.D.2d 626 (2d Dep't 1988) ........................................... 39

Dewitt v. Home Depot U.S.A., Inc.,
    2012 WL 4049085 (E.D.N.Y. Sept. 12, 2012) ............................... 23

Dineen ex rel. Dineen v. Stramka,
    228 F. Supp.2d 447 (S.D.N.Y. 2002) ................................... 24, 25

Dunn v. Brown,
    261 A.D.2d 81, 81(2d Dep't 1999)(2d Dep't 1999) ..................... 23, 25

Ellsworth v. City of New York,
    269 A.D.2d 654 (3d Dep't 2000).......................................................... 43

Estate of Jacques v. City of New York,
    104 F.Supp.3d 414 (S.D.N.Y. 2015) ................................................... 42

Estate of Sowards v. City of Trenton,
    125 Fed. Appx. 31 (6th Cir. 2005) ...................................................... 41

Fortunati v. Campagne,
    681 F.Supp.2d 528 (D.Vt. 2009) ........................................................ 42

Goronowski v. Spencer,
    424 F.3d 285 (2d Cir. 2005) ........................................................ 28, 31

Haddock v. City of New York,
    75 N.Y.2d 478(1990)......................................................... 37, 38, 40

Harsco Corp. v. Segui,
    91 F.3d 337 (2d Cir. 1996) ................................................................ 33

Hundley v. District of Columbia,
    494 F.3d 1097 (DC Cir. 2007)............................................................ 41

Ingrassia v. Lividikos,
    54 A.D.3d 721 (2d Dep't 2008)........................................................... 41

James v. Chavez,
    511 Fed. Appx. 742, fn. 5 (10th Cir. 2013) ........................................ 41

Jimenez v. Shahid,
    83 A.D. 3d 900 (2d Dep't 2011)......................................................... 34

Kane v. Lewis,
    604 Fed. Appx. 229 (4th Cir. 2014) ................................................... 42

Kenavan v. City of New York,
    70 N.Y.2d 558(1987)......................................................................... 37

Kirsch v. Fleet St., Ltd.,
  148 F.3d 149 (2d Cir. 1998) ................................................................... 26

Kush v. City of Buffalo,
  59 N.Y.2d 26 (1983) ............................................................................. 41

Lamont v. New Jersey,
  637 F.3d 177 (3rd Cir. 2011) ................................................................. 41

Leland v. Moran,
  100 F. Supp. 2d 140 (N.D.N.Y. 2000) ................................................... 34

Los Angeles v. Mendez,
  137 S.Ct. 1539 (2017)...................................................................... 41, 42

Lubecki v. City of New York,
  304 A.D.2d 224 (1st Dep't 2010) ..................................................... 36, 37

Lundberg v. State,
  25 N.Y.2d 467(1969)............................................................................. 33

Manhattan by Sail, Inc. v. Tagle,
  873 F.3d 177 (2d Cir. 2017) ............................................................. 31, 32

Marin v. City of New York,
  190 Misc.2d 809, 739 N.Y.S.2d 523 (1st Dep't 2002)......................... 34

Mazzaferro v. Albany Motel Enterprises, Inc.,
  127 A.D.2d 374 (3d Dep't 1987)...................................................... 23, 25

Mon v. City of New York,
  78 N.Y.2d 309 (1991)............................................................................ 38

Mustafa v. Povero,
  2017 WL 4169339 (W.D.N.Y. Sept. 19, 2017).................................... 36

Norton v. Sam's Club,
  145 F.3d 114 fn. 1 (2nd Cir. 1998)....................................................... 22

Paul v. City of New York,
2017 WL 4271648 (S.D.N.Y. Sept. 25, 2017) ..................................................... 36

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133(2000).......................................................................................... 28

Rifenburg v. Hughes,
2016 WL 866344 (N.D.N.Y. 2016)....................................................................... 33

Salcedo v. New York City Hous. Auth.,
179 A.D.2d 440 (1st Dep't 1992) ......................................................................... 39

Salim v. Proulx,
93 F.3d 86 (2d Cir. 1996) ........................................................................... 42, 43

Sawyer v. Wright,
196 F. Supp.2d 220 (E.D.N.Y. 2002) .................................................................... 23

Schwapp v. Town of Avon,
118 F.3d 106 (2nd Cir. 1997) ............................................................................. 22

Shah v. Wilco Sys.,
76 Fed. Appx. 383 (2nd Cir. 2003)....................................................................... 22

Spearman v. Dutchess County,
2008 US Dist. LEXIS 57316, fn. 11 (NDNY 2008) ............................................ 41

State Street Bank v. Inversiones Errazuriz,
374 F.3d 158 (2d Cir. 2004) ............................................................................... 22

Tango by Tango v. Tulevich,
61 N.Y.2d 34 (1983) .................................................................................... 39, 40

Tolbert v. Queens College,
242 F.3d 58 (2nd Cir. 2001) ............................................................................... 22

Torres v. City of New York,
2017 WL 2191601 (S.D.N.Y. May 17, 2017) ....................................................... 36

Valdez v. City of New York,
18 N.Y. 3d 69, 80 (2011)18 N.Y.3d ................................................................. 34, 35

Velez v. City of New York,
730 F.3d 128 (2d Cir. 2013) ........................................................ 34, 35

Weissman v. Dawn Joy Fashions, Inc.,
214 F.3d 224 (2d Cir. 2000) ........................................................ 26

Wyatt v. State of New York,
176 A.D.2d 574 (1991) ........................................................ 38


STATUTES

28 U.S.C. § 1291 ........................................................ 1

42 U.S.C. § 1981 ........................................................ 16

NY GML Section 50-h ........................................................ 15

Title 42 U.S.C. § 1983 ........................................................ 1, 16


RULES

Fed. R. App. P. 32(a)(7)(B) ........................................................ 45

Fed. R. App. P. 32(g) ........................................................ 45

FRCP 50(b) ........................................................ 18

FRCP Rule 56 ........................................................ 16

## STATEMENT OF SUBJECT MATTER
## & APPELLATE JURISDICTION

The United States District Court for the Northern District of New York possessed subject matter jurisdiction over this action because it was based upon the presentation of a federal question as embodied in Federal Law, to wit: Title 42 U.S.C. § 1983.[1]  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

---

[1] All other federal claims were dismissed by the time of trial.  (SPA1).

## ISSUES PRESENTED

1)      Can Defendant-Appellee Kevin Miller's intentional acts support a negligence claim?

The Court should answer this question in the negative and affirm the judgment below.

2)      Did the evidence presented at trial support the jury's verdict for Officer Miller?

The Court should answer this question in the affirmative and affirm the judgment below.

3)      Did Defendant-Appellee City of Binghamton owe plaintiff a special duty?

The Court should answer this question in the negative and affirm the judgment below.

4)      Do Defendants-Appellees deserve immunity for their discretionary acts?

The Court should answer this question in the affirmative and affirm the judgment below.

5)      Can the City be liable for Officer Miller's intentional acts if the jury ruled in Officer Miller's favor?

The Court should answer this question in the negative and affirm the judgment below.

STATEMENT OF THE CASE

A. Intelligence

On August 19, 2011, Inv. James Hawley, a member of the Binghamton Special Investigation Unit assigned to the Broome County Drug Enforcement Task Force ("SIU/BC"), through a Confidential Informant ("CI"), learned that a man named Pride and others had robbed local drug dealers. (A195; A366). The CI also told Inv. Hawley that five to six days before the warrant application they saw Pride and two males in a silver Infinity with handguns.[2] (A366; Dist. Dkt. 86-5). At 3:47 PM on August 24, 2011, Inv. Hawley obtained a no-knock warrant authorizing the search of the first floor apartment of 11 Vine Street and seizure of Pride. (A181; Dist. Dkt. 86-5).

B. Surveillance

To confirm whether Pride was at 11 Vine Street, Invs. Hawley and Kane conducted an hour of surveillance from 8:00 until 9:00 PM on August 24, 2011. (A182; A184; A343-4). They observed Pride engage in conduct consistent with a drug transaction at 11 Vine Street. (A176, A195, A343-4; Dist. Dkt. 86-8 & 86-9).

C. The SWAT Team Activation & Briefing

Because of Pride's violent past, a SWAT Team executed the Search Warrant

---

[2] The trial transcript erroneously states "handcuffs" instead of handguns. *See* Dist. Dkt. 86-7 & 10.

3

at 11 Vine Street. (A186; A194; A322; A347; A355). Before dawn on August 25, 2011, the Binghamton/Vestal/Johnson City SWAT Team ("SWAT") assembled with the SIU/BC for a briefing about the execution of the warrant. (A237-8, A310, A331-2, A659; A685, A687-8, A691, A695-6, A707, A859). In the briefing, SWAT learned of the target location and that the subject of the warrant was Pride. (A172; A695; Dist. Dkt. 86-8 & 86-9). SWAT was also advised that a Hispanic female and a child of unknown age might be in the apartment with Pride. (A322; A620).

While Plaintiff argues the Binghamton Police Department had an obligation to obtain the plans of the interior of 11 Vine Street from the "building construction department" (Appellant Brief p. 17-8), Plaintiff never proved these plans exist, and the trial court precluded Plaintiff's Counsel from making this argument in his closing statement. (A1647).

## D. **The Plan**

At the briefing, SWAT decided to make a "dynamic entry" at 11 Vine Street. (A308; A315-6; A589; A599; A683; A718; A730-1; A860-1). Officers received specific assignments; Inv. Hawley was to point out the correct apartment door. (A356; A370). Officer Burnett was assigned to operate the ram. (A239; A714; A853). Officer Miller was designated the "point man," *i.e.*, the first to enter the apartment. (A251; A286; A308; A442; A712). Officer Charpinsky was assigned to be the second person in the stack. (A251, A286). The team leader, Officer Spano,

4

would be the third person in the stack. (A619-20; A862; A687). The remainder of the team would enter in a specific "stack-order" while yelling for those inside to get down on the ground. (A250; A546; A598; A653; A660; A860-1). Each officer covered his "area of responsibility" until the apartment had been secured. (A300; A305-6; A545-6; A666-7; A669). SWAT would announce themselves by yelling warnings after the first ram strike and continue yelling until the last room was secured. (A295-7; A307; A545-6, A599; A619-20; A855). Because a small child was possibly in the apartment, diversionary devices, a.k.a "stun grenades" and/or "flash bangs," were ruled out. (A322; A530; A543-4, A620, A695-6).

## E. **SWAT's Choice of Equipment & Tactics**

After the briefing, SWAT boarded their "truck," which Officer Miller described as a large "bread truck." (A860-1). The team boarded the truck in reverse stack order and drove to a spot one hundred yards from 11 Vine Street, and then approached the building on foot. Id. The "truck" is used to store the team's equipment. (A238; A242-3; A304; A698; A708; A907).

Plaintiff's Counsel focuses on the tools and tactics *not* used. (Appellant Brief pp. 19-21). At trial, however, Plaintiff failed to introduce proof of any rules or policies removing discretion from the officers regarding surveillance, amount of intelligence needed, and/or their choice of equipment. Plaintiff nonetheless speculates different equipment or tactics may have led to a different outcome; he

5

offered no evidence to show a different amount of intelligence, or a change to surveillance, tactics or equipment would have prevented Plaintiff's injuries. Id. Officer Miller, who shot Plaintiff, testified he had all of the intelligence and equipment he needed.  (A875-6).

While SWAT has night vision goggles (Appellant Brief pp. 11 fn 7, 20-1), Officer Charpinsky testified their use at 11 Vine Street would have been inappropriate because, "if there's a flash of light that's going to wash you out if you have the goggles on so they're useless to you."  (A237; A706). On ballistic shields, another after-the-fact suggestion by Plaintiff, (Appellant Brief p. 20), Officer Charpinsky testified a shield would have been "very tight" in the hallways, would have been difficult to get through the broken door, and would have slowed the team's dynamic entry. (A314).

On the subject of less lethal force, including tasers, beanbag shotguns, and chemical agents, Officer Charpinsky testified he would have used none of these because Pride had a violent past and a recent weapons charge. (A310). Officer Miller agreed, stating the team never uses a beanbag shotgun or taser on a dynamic entry because they afford ineffective protection against a gun with real ammunition. (A872).

Cpt. Hendrickson testified SWAT uses a ram to open inward opening mechanical doors. (A471). Although Plaintiff suggests the team should have used a

6

two-man ram instead of the one-man ram it used, Cpt. Hendrickson and Officers Charpinsky and Miller testified (a) SWAT rarely uses the two-man ram because it is too big and heavy and (b) a two-man ram was too large for the hall of 11 Vine Street. (A243; A304; A321-1; A543; A713-4; A873).

Plaintiff's Counsel suggests SWAT should have used distraction devices, such as smoke or "flash bangs." (Appellant Brief pp. 21-2). Cpt. Hendrickson testified using smoke indoors could be lethal. (A469). He also explained the calculus the team uses when deciding whether to use "flash bangs": SWAT weighs the benefit of a "little bit more time to distract a person" against the danger to small children, pregnant women, and the elderly. (A543-4). The test weighs against their use. Officer Spano, team leader on August 25, 2011, testified SWAT believed a child was present (A322; A620), and the team did not use "flash bangs." (A235).

Plaintiff's Counsel claims the team should have used pole cameras, under-the-door cameras, throw cameras and tactical mirrors. (Appellant Brief p. 20). Cpt. Hendrickson testified "no SWAT Team" would use pole cameras, under-the-door cameras or tactical mirrors when making a "dynamic entry." (A525; A543). Officer Miller testified the team never used these devices or looked in mirrors during dynamic raids because the risk of giving away their position defeated the purpose of a "dynamic entry." (A859-60). Additionally, several witnesses testified cameras and mirrors are used for a "stealth entry" (i.e., a stealthy approach of a barricaded

7

subject), but not for a "dynamic entry." (A466; A477; A681; A685).[3]

Plaintiff failed to call an expert on this topic, and he presented no evidence to contradict the testimony of the officers about how their decisions comported with good police practices.

## F. **The Entry**

At 6:37 AM, SWAT was in position to execute the no-knock warrant at the first floor apartment of 11 Vine Street. (A859; A712). SWAT entered a small foyer/ hallway that lead from the front porch to the door of the first floor apartment. (A303-4, Ex. D-27 at SA 1, 3, 4, and 5). Inv. Hawley was near the front of the stack, but he remained on the porch to direct the team to the apartment door. (A356; A370). When the "ram operator" was called to the front, Officer Charpinsky made space for him by stepping across the hallway and onto a set of stairs leading to the second floor. (A298; Dist. Dkt. 86-16). Because the door was a "hollow core" door, it did not open on the first strike. (A249; A299; A545; A864). It took multiple strikes and a kick from the ram operator for the door to fall away from its hinges, allowing the team to enter the residence. (A241; 298-9; A372-3; A714; A864). When the ram first struck, the officers began yelling, and they continued yelling until they cleared the entire

---

[3] Counsel seeks to mislead this Court by conflating "stealth entries" and "dynamic entries." He alleges there were deficiencies in "prior training exercises for a similar *dynamic entry*," and the City took no steps to correct them. (Appellant Brief p. 21). The cited testimony references prior "stealth entry" training, not "dynamic entry" training. (A215; A681).

apartment. (A295-8; A307; A333; A403; A545-6, A599; A843; A855-6).

None of the officers recalled the specific number of times the ram hit the door. (A241; A298-9; A372-3; A714; A864). While Officer Miller testified that it "seemed like an eternity" and maybe a minute, Inv. Hawley stated it took 30-45 seconds, and Officer Charpinsky stated that probably it took 30 to 40 seconds to breach the door. (A218; A372-3; A714).

Although opening the door with the first ram strike is ideal and the goal (A239-40; A986), breaching the door within 30 to 40 seconds is acceptable. (A312; A324; A545; A863). SWAT is trained to keep striking such doors because (a) any strike could open it, and (b) retreat could lead to a hostage situation. Id.

## G. **Plaintiff's Versions of Events**

Plaintiff Jesus Ferreira had recently traveled to Binghamton with his friend Pride. (A1303-4). While in Binghamton, they stayed at Pride's girlfriend's apartment at 11 Vine Street, smoked marijuana and relaxed. Id. While at 11 Vine Street, Plaintiff slept on a sectional couch in the living room of the first floor apartment. (A1366; A1410; A1741; Ex. D-27 at SA-6, 8, and 11-13).

On the morning of August 25, 2011, Plaintiff awoke to the sound of "yelling and banging in the hallway." (A1368; A1415). After two bangs or two to three seconds of banging, the door flew open. (A1368; A1414-15; A1424). Plaintiff claims he stretched out his hands above his head and turned his torso slightly toward the

9

door, "so [he] wouldn't be a threat to whoever was coming in." (A1368-9; A1415; 1417-18).

Cross-examination revealed Plaintiff previously denied changing his position and/or turning his body toward the door, which was to his left. (A1371; A1418-19; A1421; A1741). At trial, Plaintiff testified he saw sunlight streaming through the door (A1428), and also saw an officer enter the doorway wearing a helmet and goggles and holding a gun. (A1369; A1417). The first officer stood by the doorway and fired his weapon. (A1368; A1410; A1424). Plaintiff was shot once in the abdomen. (A1468-9).

Although he admitted hearing yelling in the hallway, Plaintiff denied hearing anyone, including the first officer, telling him to, "Get down" before the shot. (A1415). Plaintiff admitted that other officers streamed in the door and into the apartment after the shot, yelling for those inside to get down. (A1369).

Plaintiff testified officers initially flipped him over into a "superman" position at the far end of the couch, but then moved him to the floor and handcuffed him with his hands behind his back. (A1371; A1375; A1427-8). Plaintiff recalled an officer asking him, "Why'd you have that joystick in your hand," referring to an Xbox game controller on the floor. (A1371-3; A1424). Plaintiff admitted he used the game controller the night before, but he claimed he laid it on the floor on the left side of the couch (the same side as the apartment door) before going to sleep. (A1369;

10

A1371).

While on the floor, Plaintiff claims he heard an officer suggest putting the game controller in his hand. (A1372-3; A1424). While Plaintiff was on the ground, he saw a foot kick the controller to near Plaintiff's stomach while his hands were behind his back. (A1372; A1375; A1424-6). Plaintiff did not testify anybody put the controller into his hands. (Dist. Dkt. Doc. 86-3 at p. 184-5).

## H. City's Version of Events

The door to the apartment did not open neatly; however, when the door jamb separated from the wall, Officer Miller hit it with his shoulder and forced his way into the apartment. (A864).  When Officer Miller entered, he held his rifle at a slight angle, with the safety switched on. (A865-6).

When Officer Miller entered the living room, he saw a figure rising from the couch directly ahead of him. (A843; 853-4; A903-4; A1741; Ex. D-27 at SA-6, 8). Officer Miller yelled, "Down, Down, Down," but the figure continued to stand up. (A893-4). This figure appeared draped in a blanket, which may have been falling away. (A737; A778). Officer Miller did not see what happened to the blanket because he trained his focus on the figure's hands, which could carry a weapon. (A855). Officer Miller testified how, in that brief moment, he saw what appeared to be a small gray snub-nose .38 pistol in the figure's hand as the figure stood. (A767;

A842; A898; A903).[4]

After taking two to three steps into the room (or within two to three seconds of entering the room), Officer Miller fired a single shot because (a) he saw what he believed was a gun in the figure's hand and (b) the figure failed to comply with his order to get down. (A780; 843; 853-4; A857; A903-4; Ex. D-27 at SA-6-8, 14). At trial, Officer Miller said he responded to specific stimuli as trained. (A780.) The stimulus was "a man doing exactly the opposite of what I was asking him to do when he had a gray object in his hands." (Id.)

The shot hit and spun the figure (Plaintiff), and knocked him down. Plaintiff ceased to be a threat to Officer Miller or those officers behind him, so no additional shots were fired.  (A867).

Officer Miller testified he entered the apartment in a "walking weaver" stance, which he described as a natural gait in a slightly hunched body position with knees flexed and a heal-to-toe movement.  (A731; 854). Because of that stance, Officer Miller could not say exactly how far into the room he was when he shot, but he did say the figure was "very close" and standing near the couch. (A892-4).

Officer Miller testified he used a "point-shoot" shooting technique, in which the officer holds the rifle at a downward angle and aims by pointing the (trigger)

---

[4] Plaintiff's Exhibit P-76 (A1742) shows a black snubnose .38 with wooden grips; Defendant's Exhibit D-26 (A1906) shows a stainless steel or grey snubnose .38.

finger along the side of the barrel. (A865). To fire the weapon, Officer Miller had to lift the rifle slightly, use his thumb to move the safety catch to an "on" position, and engage the trigger with his finger. (A865-6). Officer Miller testified he hit his intended target, Plaintiff, with his shot. (A866).

## I. **Securing the Scene**

Officer Charpinsky was assigned as the second officer to enter the apartment (A251, A286, A299). After Miller stepped through the door, Officer Charpinsky stepped off the stairs across the foyer to resume his position in the stack. (A298; Dist. Dkt. 86-16). Officer Charpinsky heard a shot before he crossed the threshold of the apartment. (A305; Dist. Dkt. 86-16).

Officer Charpinsky was not "in a position to see what Miller allegedly saw" (Appellant Brief p. 23). Officer Charpinsky would have been shirking his responsibility as SWAT member if he could see what Miller saw. Each member of SWAT has an "area of responsibility," which is the opposite of the team member in immediately in front of him. (A299-300; A305-6; A666; A669). Because Officer Miller went to the right, Officer Charpinsky had to clear to the left, specifically the hallway on the left side of the living room, which led to the back of the apartment. (A305-6; A1741; SA-5; Dist. Dkt. 86-16). After Officer Miller's shot, Officer Charpinsky stayed in the living room. (A306).

When he turned back to the right, Officer Charpinsky saw Plaintiff lying face down, partially on the couch with his legs on the ground. (A254-6; A306). Miller immediately told Officer Charpinsky to search for a gun in the cushions of the couch, but they did not find one. (A844). They saw Plaintiff "digging" his hands into the couch, and warned him to stop doing that. (A277-8; A876). Their search proceeded from the couch down to the ground near Plaintiff. (A844-5). Officer Miller saw something on the ground, and he tried to "knock" it out from under Plaintiff. He realized for the first time that what he had seen was not a gun, but a game controller. (A845-6). Officer Miller admitted yelling at Plaintiff and asking him why he had the controller in his hand. (A846).

Officer Governanti returned to the living room, moved Plaintiff from the couch to the floor, handcuffed him, and then patted him down. (A279; A868; A853).

## J. **Provision of Medical Care**

Plaintiff's Amended Complaint alleged a denial of medical care. (A40 at ¶ 14; A45 at ¶ 47; A46 at ¶51; A47 at ¶ 53). Plaintiff admits, however, that when handcuffed he was placed on his right side, in a "recovery position" with his wound high. (A1372; Dist. Dkt. Doc. 86-1 at 118-9). When the apartment was secure, Inv. Hawley heard SWAT call for a medic and he went outside to ask the SIU/BC to radio for medics. (Dist. Dkt. Doc. 86-1 at 118-6). Radio data shows the request for medics at 6:40:34 AM, 3 minutes and 34 seconds after SWAT arrived at 11 Vine

14

Street. (Dist. Dkt. Doc. 86-10). The medics arrived at 6:44 AM, left the scene at 7:00 AM, and arrived at Wilson Hospital at 7:08 AM. (Dist. Dkt. Doc. 86-18). Responding to Defendant City's motion for partial summary judgment, Plaintiff denied asserting a denial/delay of medical care claim, and the court below dismissed Plaintiff's claim regarding medical care before trial. (Dist. Dkt. Doc 89 at 23).

## K. **Expert Testimony**

Plaintiff and Defendants retained forensic pathologists to testify as expert witnesses at trial. Plaintiff's expert, Dr. Scott LaPoint, corroborated Plaintiff's version of events, while Defendants' expert, Dr. James Terzian, corroborated Officer Miller's version of events. (A1124-A1126, A1468-A1469).

## L. **Procedural History**

Plaintiff filed a notice of claim on or about September 19, 2011. Despite Plaintiff's allegation that "Defendants never requested a 50-H hearing, thereby waiving their right to one," (A7; A36 at ¶ 16), Plaintiff sat for NY GML Section 50-h hearing on April 5, 2012. The claim was not compromised.

On August 22, 2012, Plaintiff commenced this action in the Eastern District of New York. (A3). On January 29, 2013, it was transferred to the Northern District of New York. (A4). Issue was joined on February 15, 2013. (A4).

15

On March 25, 2014, Plaintiff filed an Amended Complaint. (A7; A36). The Amended Complaint alleged a mix of federal civil rights claims and state law tort claims.

The City, Chief Zikuski, and the individual Police Officers answered on April 9 and 10, 2014. (A9, A50, A59, A67).

On January 8, 2015, the parties stipulated to the dismissal of Defendants Spano, Zikuski, Burnett and Hendrickson; the court "so ordered" the stipulation. (A11, A76). The City of Binghamton, the Binghamton Police Department, and Officer Miller remained as defendants.

On January 29, 2016, the Defendant City moved for partial summary judgment pursuant to FRCP Rule 56 on all claims except for Plaintiff's claims of excessive force and state law claims of assault and battery. (A18; Dist. Dkt. Doc. 86).

On June 2, 2016, the District Court granted partial summary judgment to the City, dismissing Plaintiff's: (1) false arrest claim at the scene of 11 Vine Street, (2) Eighth Amendment claim, (3) malicious prosecution claim, (4) 42 U.S.C. § 1983 "equal protection" and 42 U.S.C. § 1981 "due process" claims, (5) Monell claim against the City, (6) ADA claim, (7) state law claims for negligent hiring and supervision, (8) state law claim for denial of medical care, (9) and any claim for punitive damages against the City of Binghamton.  (A20; Dist. Dkt. Doc. 98).

16

After the District Court granted partial summary judgment, the remaining causes of action were: (1) a federal excessive force claim, (2) federal false imprisonment claim for the time after Plaintiff was removed from the situs of the search warrant,[5] (3) state law claims of assault and battery against Officer Miller, and (4) *respondeat superior* liability against the City of Binghamton.

The matter proceeded to trial on January 17, 2017. The jury returned a verdict on January 27, 2017. (A26-8). The jury found Plaintiff failed to prove an excessive force/ state law battery claim against Officer Miller. (A28; Dist. Dkt. 170). The jury also found the City of Binghamton not liable under a theory of *respondeat superior* for any state law battery by Officer Miller or any other officer. Id. As to Officer Miller's negligence the jury answered, "No," finding Officer Miller not negligent. Id. However, the jury then incongruously found the City liable in negligence under the theory of *respondeat superior*. Id. The jury awarded Plaintiff $500,000 in past damages and $2.5 million in future damages over the course of 30 years. Id. The jury found Plaintiff 10% comparatively negligent and the City 90% at fault.

On February 8, 2017, the City moved for judgment as a matter of law and sought an extension of time for further briefing so it could receive the trial transcript. (A28, Dist. Dkt. 174). Also on February 8, 2017, Plaintiff moved for judgment as a matter of law. (A28, Dist. Dkt. 175).

---

[5] Plaintiff discontinued this claim at trial after the close of the proof. (*Cf.* A1485.)

After extensive briefing by both parties, on September 27, 2017, the District Court issued a final Decision and Order. The court granted the City of Binghamton's FRCP 50(b) motion for judgment as a matter of law and dismissed Plaintiff's action as against the Defendant City of Binghamton and denied Plaintiff's motion concerning Officer Miller. (Decision & Order at SPA1). On October 10, 2017, Plaintiff filed a Notice of Appeal from the District Court's Decision and Order. (Notice of Appeal at A1979).

On October 10, 2017, Plaintiff filed a Motion for Reconsideration. (A1962; A1963). On October 27, 2017, the Defendant City filed its opposition to Plaintiff's Motion for Reconsideration. (A1982). On October 30, 2017, Plaintiff filed reply papers regarding his Motion for Reconsideration. (A1991). Finally, on November 6, 2017, the Defendant City filed a sur-reply in opposition to Plaintiff's Motion for Reconsideration. (A1997).  Plaintiff's Motion for Reconsideration remains pending.

## SUMMARY OF THE ARGUMENT

In this case, a City of Binghamton police officer (Defendant-Appellee Kevin Miller), who was part of a SWAT team effectuating a dynamic entry into an apartment with a warrant, fired a non-lethal shot at Plaintiff-Appellant Jesus Ferreira when Ferreira disregarded loud police instructions to "get down!" and instead came towards the officer holding an object the officer took to be a gun. After a weeklong trial, a jury found Officer Kevin Miller was not negligent and did not use excessive force when he shot Plaintiff. The jury also incongruously found Defendant-Appellee City of Binghamton negligent under a claim of *respondeat superior*.

Following post-trial motions by both sides, the court below: (a) dismissed the jury's logically and legally incorrect verdict against the City and (b) refused to impose a verdict against Officer Miller. The decision of the lower court on these motions was sound, and this Court should affirm.

Plaintiff does not claim Officer Miller did anything negligently. In Plaintiff's rendition of the facts, Officer Miller intentionally shot him perceiving no threat. Under New York law, the intentional acts comprising Plaintiff's claim cannot germinate a negligence claim.

The Court should not disturb the jury's verdict for Officer Miller. The jury had ample evidence to support its verdict for Officer Miller. The jury, as was their right, credited Officer Miller's testimony that Plaintiff failed to comply with police

orders to get down and instead approached the officer holding an object that appeared to be a gun. The jury, as was also their right, disbelieved Plaintiff's version that Officer Miller shot him in cold blood and without provocation in front of a team of highly trained police officers. The law does not permit this Court to substitute its credibility determinations for that of the jury.

Because the jury found for Officer Miller, there can be no *respondeat superior* liability against the City. A claim for *respondeat superior* cannot survive with no surviving claim against the underlying employee. When the jury found for Officer Miller, any potential *respondeat superior* liability against the City evaporated.

The City cannot be liable for negligence because it owed plaintiff no special duty. Plaintiff concedes this by failing to even raise it. No evidence presented at trial suggested that the City had a special relationship with Plaintiff or undertook any special responsibility towards him that it did not have towards the general public.

Even if this Court somehow finds a special duty to Plaintiff, state law governmental immunity shields the City for its discretionary decisions made in the SWAT team's planning and execution of the entry permitted by the search warrant for 11 Vine Street.

Finally, even if Plaintiff could somehow surmount the "special duty" and "governmental immunity" hurdles to a negligence verdict against the City, the evidence the jury believed would not permit it. Had plaintiff not stood up and

advanced towards Officer Miller with something in his hands after the officers instructed him to get down, Officer Miller would not have shot him. No decisions made before Officer Miller's entry prompted Plaintiff's decision to disobey the clear instruction from the officers. Nothing in Plaintiff's extended game of Monday morning quarterbacking changes this calculus: Officer Miller had the right to make a split second decision in a dangerous and rapidly changing situation to use force against a person who disregarded police instructions and approached the officer with an object appearing to the officer to be a gun.

<u>**ARGUMENT**</u>

<u>**POINT I**</u>

**THIS COURT SHOULD AFFIRM THE DISMISSAL OF ALL CLAIMS, ISSUES, AND ARGUMENTS PLAINTIFF HAS NOT PRESERVED FOR APPEAL IN HIS BRIEF**

This Court does not consider arguments or issues not developed and argued in a party's brief. <u>24/7 Records, Inc. v. Sony Music Entertainment</u>, 429 F.3d 39, 43 (2d Cir. 2005) *citing* <u>State Street Bank v. Inversiones Errazuriz</u>, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned."); <u>Shah v. Wilco Sys.</u>, 76 Fed. Appx. 383, 384-5 (2nd Cir. 2003)("We also do not ordinarily consider appellants' arguments not raised adequately in an appellant's opening brief."); <u>Tolbert v. Queens College</u>, 242 F.3d 58, 75-6 (2nd Cir. 2001); <u>Norton v. Sam's Club</u>, 145 F.3d 114, 117-8 fn. 1 (2nd Cir. 1998); and <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 112 (2nd Cir. 1997).

Here, the only issues Plaintiff preserved for appeal are (1) whether Officer Miller was negligent in shooting Plaintiff and (2) whether the City was negligent in planning and executing the search warrant. (Appellant's Brief p. 30, fn. 13.) Plaintiff failed to preserve any arguments concerning his claims of excessive force, and

assault and battery.[6] This Court should treat all such claims as abandoned and dismissed.

## POINT II

## OFFICER MILLER CANNOT BE NEGLIGENT FOR INTENTIONAL ACTS

The only claim on appeal against Officer Miller is for alleged negligence in shooting Plaintiff.[7] The claim is legally defective. "Allegations of intentional conduct cannot form the basis of a claim founded in negligence." Dunn v. Brown, 261 A.D.2d 81, 81(2d Dep't 1999) (internal citations omitted). New York courts deem claims of unreasonable excessive force subsumed by an assault cause of action, not negligence. Mazzaferro v. Albany Motel Enterprises, Inc., 127 A.D.2d 374, 376 (3d Dep't 1987) (internal citations omitted); Dewitt v. Home Depot U.S.A., Inc., DOCKET NO, 2012 WL 4049085, at *10 (E.D.N.Y. Sept. 12, 2012); Sawyer v. Wright, 196 F. Supp.2d 220, 228 (E.D.N.Y. 2002). This is true even where "assaultive acts were committed under a mistaken belief as to the true facts." Mazzaferro, 127 A.D.2d at 376. A defendant's "lack of care in the course of committing an assault does not convert the action from intentional tort to negligence." Id., 127 A.D.2d at 376. "When a plaintiff asserts excessive force and

---

[6] Plaintiff's Brief does not mention "battery," makes a single conclusory reference to "assault" (p. 50), and makes only nine references to "excessive force." (Appellant's Brief pp. 17, 18, 21-2, 47 n. 18, 48 and 52).

[7] Appellant Brief p. 30 fn 13.

assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." <u>Dineen ex rel. Dineen v. Stramka</u>, 228 F. Supp.2d 447, 454 (S.D.N.Y. 2002) (internal citations omitted).

At trial, Plaintiff had a full opportunity to match Officer Miller's version of events with his own. Contrary to Miller's testimony, Plaintiff told the jury the Xbox controller was on the floor, not in his hand, and he was lying down on the couch with his hands up when the officers entered 11 Vine Street. (A1371). He also contradicted Officer Miller's version when he testified the officers said "put the joystick in [Plaintiff's] hand and be quiet." (A1373). Finally, Plaintiff testified the officers kicked the joystick next to him. (A1425-1426).

After 7 days of receiving evidence, the jury found for Officer Miller on Plaintiff's claims of battery, excessive force, and negligence. (A26-A28). It also found Plaintiff's own negligence warranted a 10 percent reduction of his verdict against the City. (A28). The verdict for Officer Miller and on Plaintiff's comparative negligence shows the jury did not believe Plaintiff's version of events, as it was its prerogative.

Even if the jury believed Plaintiff, his version of events does not support a negligence claim. Had the jury believed Plaintiff, it would have believed (1) Officer

Miller shot Plaintiff lying on the couch with his empty hands in the air, and (2) Officer Miller perjured himself and lied to City investigators about what transpired.

Plaintiff's version describes deliberate, intentional acts. Plaintiff cannot describe acts of excessive force and assault and then try to repackage them as a negligence claim. <u>Dineen</u>, 228 F.Supp.2d at 454; <u>Mazzaferro</u>, 127 A.D.2d at 376. His claim of an intentional cover-up is fatal to his negligence claim. <u>Dunn</u>, 261 A.D.2d at 81. Plaintiff's negligence claim against Officer Miller fails as a matter of law.

## POINT III

### THIS COURT SHOULD AFFIRM THE LOWER COURT'S DENIAL OF PLAINTIFF'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

This Court should review Plaintiff's appeal of the District Court's denial of his Rule 50 motion viewing the evidence in the light most favorable to Officer Miller. Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 227 (2d Cir. 2000) (citing Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir. 1998)). The Court may disturb Officer Miller's verdict only if (1) there is such a complete lack of evidence that the jury's verdict could only have been the product of sheer surmise or conjecture, or (2) there is such overwhelming evidence for Plaintiff that reasonable and fair minded people could not arrive at a verdict against him. Kirsch, 148 F.3d at 161 (2d Cir. 1998). Neither circumstance applies here.

Plaintiff's claim against Officer Miller rests solely on the allegedly negligent shooting of Plaintiff.[8] The evidence demonstrated Officer Miller acted reasonably. Plaintiff attempts to muddle the issue with red herrings, but just one issue remains: could a rational jury credit Officer Miller's testimony that Plaintiff held in his hands an object Officer Miller believed was a gun and defied commands from the officers by advancing toward Miller? Plaintiff's version of the event required the jury to believe Officer Miller attempted to murder or seriously injure Plaintiff in cold blood

---

[8] Appellant Brief p. 30 fn 13.

in full view of highly trained police officers. To credit Plaintiff's story would require the jury to conclude, without supporting evidence, that Officer Miller knowingly shot Plaintiff lying on the couch with his empty hands in the air. Plaintiff's narrative required the jury to conclude, without evidence, that none of the officers objected to a cold blooded shooting, risking their own careers to protect Miller. The jury verdict for Officer Miller on the record before it was not the result of sheer surmise or conjecture.

Plaintiff cherry picks testimony from Sergeant Michelle Stebbins and Chief Joseph Zikuski, but their testimony does not support his version of events either. When Plaintiff's Counsel asked Sgt. Stebbins at trial whether her investigation yielded any evidence that Plaintiff advanced towards Officer Miller, Sgt. Stebbins responded "I wouldn't be able to tell that from my investigation." (A1308). Thus, Plaintiff's claim that Sgt. Stebbins found no indication that he was advancing on Officer Miller rings hollow. (Appellant's Brief, p. 8).

So, too, does Plaintiff's Counsel's claim that Chief Zikuski admitted that police documents indicate that Plaintiff was shot on the couch. (Appellant's Brief, p. 8). The police documents contain multiple accounts, including Plaintiff's. (A1373). That the police took record of Plaintiff's account hardly requires that the Court overturn a jury's verdict.

On the other hand, to credit Officer Miller's version of events, the jury needed to determine that just one witness – Plaintiff – was not credible when he said he obeyed the officers' commands. The jury watched Plaintiff testify. There are many reasons a jury could have disbelieved him, ranging from innocent reasons (he testified he had awoken from sleep just before the officers entered and may have a foggy memory of the incident)[9] to the not so innocent reasons (Plaintiff was interested in the outcome and stood to gain money from his testimony). There are many logical and sound reasons for the jury to have discounted Plaintiff's version of events; this Court, therefore, may not disturb the jury's verdict.

The Court cannot "weigh conflicting evidence, determine the credibility of witnesses, or substitute [its] judgment for that of the jury." Goronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005). The Court "cannot consider evidence favorable to appellant that the jury need not have believed." Id. An appellate court "must disregard contradicted evidence and testimony from impeached and interested witnesses that supports appellant." Id. at 293 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151(2000)). It is not an appellate court's "task to retry the case and reweigh the evidence." Id. at 292. Instead, the Court must "give deference to all credibility determinations and reasonable inferences of the jury," but cannot

---

[9] Appellant's Brief, pp. 2-3.

28

"otherwise consider the weight of the evidence." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008).

Plaintiff's argument hinges entirely on the credibility determinations this Court may not make. He argues, for instance, an Xbox controller, when viewed in isolation in the safety of a well-lit courtroom, does not look like a gun. (Appellant's Brief, p. 5). The jury finding in Officer Miller's favor must have considered the officer's testimony that he had a split-second decision to make as he observed Plaintiff "doing exactly the opposite of what I was asking him to do when he had a gray object in his hands." (A780). The jury understood Officer Miller was not examining a picture of an Xbox controller in a quiet courtroom; he was glimpsing an unknown object believed to be a gun in the hands of a man advancing towards him in a dangerous setting. (Id.) Plaintiff's photograph of an Xbox controller is insufficient to disturb the jury's verdict in Officer Miller's favor.

The jury also could disregard the testimony of Plaintiff's expert witness, Dr. Scott LaPoint. Dr. LaPoint first testified a bullet could change its trajectory if it hits a rib. (A1155). He did not recall reviewing any records showing the bullet hit or grazed Plaintiff's rib. (A1156). When confronted with the fact that the records do reflect that Plaintiff suffered a broken rib, Dr. LaPoint changed his testimony to state that a broken rib is not "terribly important" to his analysis. (A1157). He admitted he

29

has no notes or records showing he knew Plaintiff had broken rib when he rendered his opinion. (A1183). The jury could discount his testimony.

Defendants' expert, Dr. James Terzian, testified a fractured rib is important to a trajectory analysis because "ribs are hard and so if a bullet strikes a rib it can glance off, it can be deflected and that can affect the trajectory." (A1463, A1465).

Dr. Terzian also testified, "I believe [Plaintiff] was standing up or at least partly standing up when he was shot and facing the shooter who was the policemen coming in through the door." (A1468). He based this conclusion on "the trajectory of the wound." (A1468). Specifically,

> The shot in this case went in the left upper quadrant of the abdomen and the plain [*sic*] bullet fragment was found on the back almost a direct line. In order for him to be shot like that while he's lying in the bed with the shooter coming in from the left side, there's no way the gunshot could go in here and not go across the abdomen as opposed to the body. In order for that to happen the policemen would have had to walk into the room, turn around and face the complainant who was lying in the bed and shoot straight down on him, which didn't make any sense at all to me. (A1468-1469).

The jury was free to credit Dr. Terzian's testimony over that of Dr. LaPoint, who gave conflicting answers about the significance of Plaintiff's broken rib. The jury likely found that Dr. Terzian's analysis made more sense than Dr. LaPoint's version. If Plaintiff was lying down with Officer Miller to his left side, as Plaintiff suggests, it makes sense that a bullet would travel across his body rather than straight back through it. Because the bullet went straight through to Plaintiff's back, Dr.

30

Terzian's opinion that Plaintiff must have been standing and facing Officer Miller (as Officer Miller described) makes more sense. It is possible the jury also found Dr. LaPoint's testimony less credible and defensive because he changed his testimony after being confronted with evidence of Plaintiff's broken rib. Or, the jury may have automatically credited Dr. Terzian because they already credited Officer Miller's version of events over Plaintiff's. The Court must defer to the jury's findings. Brady, 531 F.3d at 133.

Plaintiff tries to distract the Court with a red herring – whether Plaintiff "spun" after being shot, and whether there was blood splatter on the floor. There is no evidence that Plaintiff could not have fallen onto the couch as Officer Miller described. Plaintiff's Counsel did not ask Dr. Terzian whether Plaintiff could have fallen onto the couch as Officer Miller described. Dr. Terzian testified there was no blood splatter on the couch or on the floor, so the lack of blood splatter on the floor provides no insight on whether Plaintiff was standing or lying on the couch. (A1504-1505; SA-12-13.) The jury heard Dr. LaPoint's testimony, weighed it against Dr. Terzian's testimony, and credited Dr. Terzian's expertise. The Court may not substitute its own credibility determination for the jury's. Goronowski, 424 F.3d at 292-293.

Plaintiff's entire legal argument hinges on one case, which does not involve an officer shooting, but rather, an accident aboard a sailing vessel. Manhattan by

Sail, Inc. v. Tagle, 873 F.3d 177 (2d Cir. 2017). There, a deckhand lost his grip on a halyard, which swung backwards and injured plaintiff. Id. at 179-80. Because the deckhand admitted the halyard "slipped from his grasp" with no external force causing it to do so, the defendant was found negligent in a non-jury trial. Id., 873 F.3d at 182-184.

Officer Miller did not testify his gun "slipped from his grasp," like the deckhand in Tagle. Instead, he reported he responded to specific stimuli as trained. (A780). The stimulus was "a man doing exactly the opposite of what I was asking him to do when he had a gray object in his hands." (Id.) Plaintiff presented no evidence reflecting this violated Miller's training. This was not a situation like Tagle in which "no external force" was present. Tagle, 873 F.3d at 182. *Plaintiff* was the external force, and the jury properly found Plaintiff's action triggered Officer Miller's reaction. Tagle provides no basis for this Court to disturb the jury's verdict in Officer Miller's favor.

## POINT IV

### THERE IS NO BASIS FOR *RESPONDEAT SUPERIOR* LIABILITY AGAINST THE CITY OF BINGHAMTON

The doctrine of *respondeat superior* holds an employer liable for the negligence of its employees committed in the scope of their employment. Lundberg v. State, 25 N.Y.2d 467, 470-471(1969). A claim based upon *respondeat superior* cannot survive if there is no underlying claim against the employee. Harsco Corp. v. Segui, 91 F.3d 337, 349 (2d Cir. 1996); Rifenburg v. Hughes, DOCKET NO, 2016 WL 866344 at * 5 (N.D.N.Y. 2016).

Here, the jury cleared Officer Miller of all liability. (SPA2). They found Officer Miller did not commit battery or use excessive force against Plaintiff, nor did he act negligently. (Id.) Absent wrongdoing by Officer Miller, there is nothing for which the City can be vicariously liable. Harsco Corp., 91 F.3d at 349. This Court must affirm the lower court's grant of judgment as a matter of law for the City on Plaintiff's negligence claim.

**POINT V**

**THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S NEGLIGENCE CLAIM AGAINST THE CITY OF BINGHAMTON**

A. <u>Plaintiff Failed to Establish a "Special Duty"</u>

To plead a successful negligence claim, plaintiff must allege defendants owed a duty to him, and defendants breached this duty, causing injury to plaintiff. <u>Jimenez v. Shahid</u>, 83 A.D. 3d 900, 901 (2d Dep't 2011). Under New York law, a municipality cannot be liable for negligence unless plaintiff can establish a "special duty" to him, "in contrast to the duty owed to the general public." <u>Leland v. Moran</u>, 100 F. Supp. 2d 140 (N.D.N.Y. 2000) (internal citations omitted).[10] The "special duty" requirement applies whenever a municipality acted in a governmental capacity when the claim arose. <u>Velez v. City of New York</u>, 730 F.3d 128, 134 (2d Cir. 2013). "Providing police protection" is a "quintessential governmental function." <u>Id.</u> at 135 (citing <u>Valdez</u>, 18 N.Y.3d at 75).

To establish such a special relationship, a plaintiff must show: (1) the municipality assumed an affirmative duty to act on plaintiff's behalf; (2) knowledge by the municipality's agents that inaction could lead to harm; (3) a direct contact between the municipality's agents and plaintiff and (4) plaintiff's justifiable reliance

---

[10] The same reasoning applies to Plaintiff's negligence claim against Officer Miller. <u>Bawa v. City of New York</u>, 94 A.D.3d 926, 927 (2d Dep't 2012) (Negligence claim dismissed against city and officers because no special duty.); <u>Marin v. City of New York</u>, 190 Misc.2d 809, 739 N.Y.S.2d 523, 525 (1st Dep't 2002).

34

on the municipality's affirmative undertaking. <u>Valdez v. City of New York</u>, 18 N.Y. 3d 69, 80 (2011).

The district court correctly ruled Plaintiff failed to establish a special relationship with the City of Binghamton. (SPA13). No evidence showed Plaintiff had any direct contact with the police or was the subject of the search warrant at issue. (SPA13). No evidence showed the City took on any particular duty specific to the Plaintiff. (<u>Id.</u>) The evidence presented at trial warranted judgment as a matter of law in the City's favor. Plaintiff does not argue he satisfied the special duty requirement.

Although Plaintiff contends the "special duty" requirement does not apply when police engage in misfeasance, as opposed to nonfeasance, this Court has rejected that argument. <u>Velez</u>, 730 F.3d at 136. This Court, looking to New York case law, found "a special duty is required whenever a plaintiff seeks to impose liability for the negligent performance of governmental functions such as policing." <u>Id.</u>, 730 F.3d at 136 (citing <u>Applewhite v. Accuhealth, Inc.</u>, 21 N.Y.3d 420 (2013)). Claims that a police department engaged in "negligent performance of policing functions" are subject to this special duty because they have "no obvious analogue" to a tort that an ordinary person might commit. <u>Velez</u>, 730 F.3d at 136, n. 11.

Plaintiff's claims stem from Officer Miller's actions while executing a search warrant, <i>i.e.</i>, within the scope of his police duties. As Plaintiff's claim against the

City is rooted in allegations of poor policing, he cannot avoid the "special duty" requirement. Contrary to Plaintiff's assertions, the special duty requirement still applies even when police inflict an injury. (Appellant's Brief at 50; *compare* Paul v. City of New York, 2017 WL 4271648, at * 9 (S.D.N.Y. Sept. 25, 2017); Mustafa v. Povero, 2017 WL 4169339, at *10 (W.D.N.Y. Sept. 19, 2017); Bryant v. Ciminelli, 267 F.Supp.3d 467, 479 (W.D.N.Y. 2017); Torres v. City of New York, 2017 WL 2191601, *3-4 (S.D.N.Y. May 17, 2017). The cases Plaintiff cites do not suggest otherwise. Plaintiff misstates the holding of Lubecki v. City of New York, 304 A.D.2d 224 (1st Dep't 2010). The Lubecki court did not hold a negligence plaintiff need not demonstrate a special duty. It did not refer to the "special duty" standard, and found, instead, that defendants did not deserve "governmental immunity,"[11] a state law affirmative defense. Id., at 235. Here, Plaintiff does not even make it that far, as the district court correctly found the City of Binghamton owed no special duty to Plaintiff as should this Court. (SPA13.)

B.  Plaintiff Conflates "Governmental Immunity" and "Special Duty"

As previously noted, Lubecki does not discuss "special duty"; it solely addresses governmental immunity. Even if "governmental immunity" were an issue here, Lubecki still does not support Plaintiff's claims. In Lubecki, a wrongful death

---

[11] Also known as the "professional judgment rule" or "judgment error rule." Lubecki, 304 A.D.2d at 233.

case, NYPD officers shot a hostage when they exchanged gunfire with an armed robbery suspect. Id., at 227-228. The gunfight erupted when one officer mistakenly believed the suspect shot another officer. Id., at 228. The Lubecki court found the City of New York not entitled to immunity because, according to the evidence at trial, even if the situation was as the NYPD officers believed it to be, the officers still violated their police protocol. Lubecki, 304 A.D.2d at 234-35. The evidence suggested, even if the suspect had shot an officer, the other officers still should not have engaged in gunfire because the other officers had good cover and a hostage was present. Id. at 231, 234-35.

Here, by contrast, Officer Miller encountered Plaintiff in close proximity, and believed he had a weapon. (A780.) The jury apparently credited Officer Miller's account. (SPA10.) No evidence demonstrated a violation of established police protocols when an officer mistakenly believes a person the officer encounters in a dangerous situation has a gun. The Lubecki court, in fact, noted that the professional judgment rule, i.e., governmental immunity, was designed for precisely such a situation. Lubecki, 304 A.D.2d at 233 (citing Kenavan v. City of New York, 70 N.Y.2d 558, 569(1987)).

Haddock v. City of New York, 75 N.Y.2d 478(1990), another case on which Plaintiff relies, also focuses on governmental immunity, not the overarching duty. It, too, is distinguishable. There, a City Parks Department employee previously

convicted of rape allegedly raped the plaintiff. The Haddock court found the City not entitled to discretionary immunity because it exercised no discretion. Id., 75 N.Y.2d at 485. The evidence submitted at trial showed that the employee fell through the proverbial cracks and no City employee exercised discretion when assigning the employee to the Parks Department. Id. at 485. Haddock differs from the case here. Officer Miller testified he believed Plaintiff had a weapon, and intentionally shot him. (A780.)[12]

Plaintiff invokes Wyatt v. State of New York, 176 A.D.2d 574 (1991), a case decided a month after Mon v. City of New York, 78 N.Y.2d 309 (1991). Mon clarified the governmental immunity doctrine, which Wyatt found to be inapplicable in the unique circumstances of the case. In Wyatt, a corrections officer who shot a dog without provocation shot two motorists without provocation years later. The Appellate Division, First Department held the State not entitled to immunity because the State violated its own protocols and used no discretion after learning of the officer's propensity to misuse his firearm. Id. at 576. Here, by contrast, Plaintiff presented no evidence at trial showing Officer Miller had any prior propensity for violence, let alone knowledge by the City of Binghamton of such propensity.

---

[12] The District Court, on this basis, noted in a footnote that, even if Plaintiff met his special duty burden, the City was entitled to "professional judgment" immunity. (SPA 13-14; fn. 3.)

Curiously, Plaintiff cites <u>Tango by Tango v. Tulevich</u>, 61 N.Y.2d 34 (1983), where the New York Court of Appeals granted "governmental immunity" to a probation officer who allowed a non-custodial mother to take her children to South Carolina, where she later abused them. This case does not support Plaintiff because it held Officer Tulevich could not be liable for acts taken within her discretion, even though harm resulted from her decision. The same is true for Officer Miller and the City of Binghamton.

<u>Clancy v. County of Nassau</u>, 142 A.D.2d 626 (2d Dep't 1988), another case invoked by Plaintiff, addresses neither special duty nor governmental immunity. <u>Salcedo v. New York City Hous. Auth.</u>, 179 A.D.2d 440 (1st Dep't 1992) pertains to an order granting plaintiff leave to amend her bill of particulars, and thus has no sway here.

None of the cases Plaintiff cited dictates reversal of the District Court's Order. Plaintiff cited no case showing the City owed him a special duty or absolved him of the obligation to establish a special duty. The Court must reject Plaintiff's *ipse dixit* argument.

Even if Plaintiff established a special duty, which he does not even attempt, the City is still entitled to governmental immunity. Plaintiff's claims rest entirely on allegations of what the City officials decided to do and not to do. This is precisely the type of situation where municipalities and their officials are entitled to immunity.

39

Haddock v. City of New York, 75 N.Y.2d 478(1990) (citing Tango, 61 N.Y.2d 34(1983); Arteagha v. State of New York, 72 N.Y.2d 212, 216,(1988)).

### C. Plaintiff's Own Acts Caused His Injury

Even if Defendants owed Plaintiff a duty, they still did not cause his injury. The sole injury at issue is Officer Miller's shooting of Plaintiff. (A36-49.)  At trial, Plaintiff's Counsel questioned City witnesses about actions they declined to take before the officers entered 11 Vine Street, but no evidence presented at trial suggests those inactions caused the shooting. Instead, Officer Miller testified the shooting was a judgment call he had to make within two seconds. (A780.)  Officer Miller gave this testimony:

> Q: When you say you were making a judgment, you were guessing, right?
> A:  We were trained to make a judgment call based on a very particular set of stimuli.
> Q: And the stimuli you saw was a man in a blanket?
> A: The stimuli itself was a man doing exactly the opposite of what I was asking him to do when he had a gray object in his hands.

(A780.)

Despite all Plaintiff's posturing, the injury had nothing to do with anything that happened before Officer Miller saw Plaintiff. It had all to do with Plaintiff's actions when Officer Miller entered the apartment.

An intervening act will "relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate

40

injury that responsibility for the injury may not be reasonably attributable to the defendant." Ingrassia v. Lividikos, 54 A.D.3d 721, 724 (2d Dep't 2008); see also Spearman v. Dutchess County, 2008 US Dist. LEXIS 57316, fn. 11 (NDNY 2008)("A plaintiff's exercise of free will, which directly precipitates his own injury, may be a superseding act that breaks a chain of causation."); Los Angeles v. Mendez, 137 S.Ct. 1539, 19 (2017) (Striking down the Ninth Circuit's "provocation rule" and advising the lower court to review the parties' briefing on proximate cause and plaintiff's superseding acts.[13]) "Any break in the nexus" between the City's actions and the shooting cuts off the City's liability. Bikowicz v. Sterling Drug, Inc., 161 A.D.2d 928, 983 (3d Dep't 1990) (citing Kush v. City of Buffalo, 59 N.Y.2d 26, 33 (1983)). Where, as here, "the intervening act is intentional…in nature, the liability of the original tort-feasor will usually be severed." Bikowicz, 161 A.D.2d at 984.

---

[13] The party's briefs cited: Lamont v. New Jersey, 637 F.3d 177, 186 (3rd Cir. 2011) (Despite illegal entry plaintiff's own noncompliant threatening conduct was a superseding cause of his injuries limiting liability); Bodine v. Warwick, 72 F.3d 393, 400 (3rd Cir. 1995) (Judge Alito's hypothetical that after unconstitutional entry a suspect's theft of officer weapon would cut off liability for injuries caused in disarming suspect); Hundley v. District of Columbia, 494 F.3d 1097, 1104 (DC Cir. 2007) (Lunge and sudden hand movement was "intervening intentional misconduct that caused" officer to shoot and kill plaintiff.); James v. Chavez, 511 Fed. Appx. 742, fn. 5 (10th Cir. 2013) (Lunge at officer was unlawful and a "superseding cause, regardless of whether his violent response was foreseeable."); Estate of Sowards v. City of Trenton, 125 Fed. Appx. 31, 42 (6th Cir. 2005) (Plaintiff's conduct of pointing a handgun toward SWAT officers was an intervening or superseding cause.) and Kane v. Lewis, 604 Fed. Appx. 229, 233-7 (4th Cir. 2014) (Illegal entry was not the legal cause of decedent's death; that was a direct result of his attempt to stab a SWAT officer.).

In addition, this Court has instructed that the "actions leading up to the shooting are irrelevant to the objective reasonableness of [the officer's] conduct at the moment he decided to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996). Rather, the reasonableness of Officer Miller's actions depends "only upon [his] knowledge of circumstances prior to and at the moment that he made the split-second decision to employ deadly force." Id., 93 F.3d at 92. Courts may not "take a broader view and consider, for example, whether the police created the need for deadly force in the first place." Fortunati v. Campagne, 681 F.Supp.2d 528, 535 (D.Vt. 2009), aff'd sub nom Fortunati v. Vermont, 503 Fed. Appx. 78 (2d Cir. 2012). "Second guessing is not appropriate," particularly where it only pertains to incidents preceding the officer's decision to use force. Estate of Jacques v. City of New York, 104 F.Supp.3d 414 (S.D.N.Y. 2015).

The Supreme Court, in the excessive force context, ruled that courts cannot "conflate[] distinct Fourth Amendment claims" by "look[ing] back in time to see if there was a *different* Fourth Amendment violation that is somehow tied to the eventual use of force." Mendez, 137 S.Ct. 1539, 1547 (2017)(emphasis in original). The Mendez Court applied this same reasoning to that plaintiff's proximate cause argument, criticizing the 9th Circuit for allowing the claims to proceed despite "a murky causal link between the warrantless entry and the injuries attributed to it." Id.,

137 S.Ct. at 1549. Plaintiff cannot maintain a claim against the City based upon events preceding Officer Miller's entry into the residence. Salim, 93 F.3d at 92.[14]

Based on the verdict, the jury apparently credited Officer Miller's testimony that Plaintiff was not lying down with his hands up, but came towards him holding what Officer Miller believed to be a weapon. (A700-02.) Plaintiff's disobedience of the officers' orders is an intervening cause.[15] Plaintiff's suggestion that he would have stayed put with his hands empty if only the officers used a two-person battering ram instead of a one-person battering ram is implausible. It also not reasonable to suggest, as Plaintiff does, that pre-entry tactics deprived Officer Miller of his right to use force when, in a dangerous, rapidly evolving situation, he saw Plaintiff "doing exactly the opposite of what I was asking him to do when he had a gray object in his hands." (A700.) Plaintiff's actions sparked a separate chain of events disconnected to anything the City did before entering the premises.

Plaintiff's actions caused his injury. The City cannot be held responsible for it.

---

[14] Plaintiff challenges the lower court's "reliance" on Ellsworth v. City of New York, 269 A.D.2d 654 (3d Dep't 2000), which the court cited in a footnote for the proposition that New York law affords no cause of action for negligent investigation. (SPA14.) Because Plaintiff renounces any claim for negligent investigation, his criticism of Ellsworth has no bearing on this appeal. (Appellant's Brief, p. 51.)

[15] Appellant's Brief at 4 (It is undisputed that, "All the while, the officers were yelling, "Police, Police, get down.")

## CONCLUSION

For the reasons set forth herein, the Defendant-Appellees respectfully request this Court affirm the lower court's decision, together with awarding them such other and further relief as this Court may deem just, equitable, and proper.

Dated:      Carle Place, New York
              May 7, 2018

                                 SOKOLOFF STERN LLP
                                 Attorneys for Defendants-Appellees

                                 /s/ Brian S. Sokoloff

                                 _____

                                 Brian S. Sokoloff
                                 Melissa L. Holtzer
                                 179 Westbury Avenue
                                 Carle Place, New York 11514
                                 (516) 334-4500
                                 File No.: 170035

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 9711 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Office Word  in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:    Binghamton, New York
          May 7, 2018


                                _____s/ Brian S. Sokoloff_____
                                Brian S. Sokoloff, Esq.

# Appendix

**i**

## TABLE OF CONTENTS

**Page**

Transcript of Proceedings held before the
  Honorable Thomas J. McAvoy, dated
  January 24, 2017
  (omitted herein)

    Defendants' Exhibit D-27 – Photographs ..............     SA-1





DEFENDANT'S
EXHIBIT
D-27





SA-4



4490



SA-6

0674



6990



SA-8

8990



SA-9



0090

SA-10





SA-11





SA-12



SA-13



0637

SA-14



SA-15



SA-16

0634



SA-17

0632



SA-18

0628

